IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CR-170 |
| | ) | (VARLAN/SHIRLEY) |
| LARRY LIST, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate.  This case is before the Court on the following pending motions

relating to expert testimony:

> (1) The United States' Motion for Pretrial Hearing to Determine the
> Admissibility of Evidence in Support of Defendant List's Mental
> Condition Defense [Doc. 60], filed on January 7, 2005;
>
> (2) The defendant's Motion for Pretrial Hearing to Determine
> Admissibility of Expert Testimony [Doc. 70], filed on January 18,
> 2005;
>
> (3) The defendant's Supplemental Motion for Pretrial Hearing to
> Determine Admissibility of Expert Testimony [Doc. 91], filed on
> February 10, 2005; and
>
> (4) The United States' Motion for Materials of Defendant's Proposed
> Expert Witness Pursuant to Federal Rule of Criminal Procedure
> 16(b)(1)(A), (B), and (C) [Doc. 118], filed on April 6, 2005.

This matter came before the Court for a hearing on the defense motions on April 4, 2005, and the

Court heard the government's motions on April 15, 2005.  Assistant United States Attorney Hugh

1

B. Ward, Jr., was present representing the government at both hearings. Attorneys Ralph Harwell and Tracy Smith were present at both hearings representing Defendant List, who was also present at both hearings. The Court took the motions under advisement at the conclusion of the respective hearings.

## I. ANALYSIS

Defendant List was originally indicted in case number 3:03-CR-60 in a two count indictment charging possession of cocaine with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime, both allegedly occurring on November 20, 2001. On July 1, 2005, the defendant gave notice in that case of his intent to use expert testimony on his mental condition. The government subsequently moved for and was permitted to have its experts conduct a mental evaluation of the defendant. The defendant was evaluated as an outpatient by Dr. William Bernet and Dr. James Walker. In late 2004, the government brought the original indictment in this case (3:04-CR-170) against the defendant and two co-defendants, and the prior indictment was subsequently dismissed upon the government's motion. Counts one and two of the prior indictment are now counts six and seven of the Second Superseding Indictment [Doc. 119] in this case.[1] On December 30, 2004, the defendant again gave notice [Doc. 46] pursuant to Rule 12.2(b), Fed. R. Crim. P., of his intent to use expert evidence relating to his mental condition bearing upon the issue of guilt. On January 5, 2005, the government gave notice [Doc. 57] pursuant to Rule 16(a)(1)(E), Fed. R. Crim. P., of its intent to use the expert testimony of Dr. William Bernet and Dr. James

---

[1]The Court notes that the government brought a Third Superseding Indictment on May 3, 2005. The counts in question also appear as counts six and seven in this new indictment.

Walker with regard to the defendant's mental condition and their court-ordered evaluation of the defendant. The parties both challenge the admissibility of the opposing expert testimony.

In 1993, the United States Supreme Court changed the standard for admission of expert testimony in federal courts with its decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Rule 702, Fed. R. Evid., provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Court in Daubert held that Rule 702 requires a trial court to ensure that scientific testimony is relevant and reliable. Id. at 589.

In Daubert, the Court outlined several factors that may be considered by the trial court in assessing the reliability of scientific expert testimony:

1. Is it testable and has it been tested?

2. Has it be subjected to peer review?

3. What is the potential rate of error?

4. Is the technique widely accepted in the relevant scientific community?

Id. at 593-94. The factors enumerated in Daubert are not exclusive, and courts have considered other factors, including whether the expert has developed his or her opinions expressly for purposes of testifying or whether the opinions were developed independently of the litigation.

Although Daubert centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon

3

specialized or technical as opposed to scientific knowledge. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147-48 (1999); <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1350 (6th Cir. 1994). The court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 526 U.S. at 152. Although the general principles established in <u>Daubert</u> apply to all experts, the enumerated considerations may or may not apply to a particular non-scientific expert. <u>Kumho Tire</u>, 526 U.S. at 149. The judge enjoys broad discretion in determining whether the factors listed in <u>Daubert</u> reasonably measure reliability in a given case. <u>Kumho Tire</u>, 526 U.S. at 153. Finally, the qualification of an expert witness should be established by a preponderance of proof. <u>See</u> <u>In re Paoli R.R. Yard PCB Litigation</u>, 35 F.3d 717, 744 (3d Cir. 1994). With this framework in mind, the Court turns to the issues surrounding the admissibility of the expert opinions to be offered in this case.

### A. The Government's Experts

The defendant challenges [Docs. 70 and 91] the admissibility of the expert opinions of Drs. Bernet and Walker, arguing that their testimony on his mental condition on October 8 and 9, 2003, the dates of the evaluation, is irrelevant to the determination of his mental condition on November 20, 2001, the alleged date of two of the offenses, and will not be helpful to the jury. He concedes that they are qualified to testify about his mental condition at the time of their evaluation but argues that their opinions on his mental condition in November 2001 are not grounded in

scientific methods and procedures.[2]  The government responds [Doc. 75] that the testimony of Drs.

Bernet and Walker is relevant because the defendant has given notice of his intent to present

evidence of his mental condition bearing upon the issue of guilt.

*1.  The Testimony of Dr. William Bernet*

Dr. Bernet, who is a licensed physician as well as being trained in forensic

psychology, began by testifying about his qualifications.  He stated that he had testified over two

hundred times as an expert in forensic psychology and had testified for both the government and the

defense in criminal trials.  Dr. Bernet said that in forensic psychology, the evaluator conducts a

retrospective evaluation to determine the subject's mental state at a point in the past.  He described

the accepted procedure for conducting a forensic evaluation as having five basic steps:

(1) Interview the subject, if available,

(2) Collect collateral information from individuals or
records from the relevant time period,

(3) Assess the data and arrive at a diagnosis,

(4) Apply the diagnosis to a question or the criteria,
and

(5) Look for malingering.

---

[2]The defendant also argues in his motions that Dr. Bernet exceeded the scope of the court-ordered mental examination by giving an opinion on the Defendant's ability to waive his Miranda rights and to make a statement to the Drug Enforcement Agency.  The Court observes that it has heard and entered a report and recommendation [Doc. 101] on the defendant's motion to suppress this statement without making use of Dr. Bernet's opinion on the voluntariness of the defendant's waiver or statement.  At the April 4 hearing, defense counsel noted this Court's prior ruling and stated that he was no longer addressing that issue with regard to Dr. Bernet.  Thus, the Court finds that this portion of the defendant's argument is moot.

5

Dr. Bernet testified that he evaluated the defendant to determine his mental condition and his waiver of the Miranda rights at the time of the November 20, 2001 offenses and produced a report with the following conclusions:

> (1) On the day of Mr. List's arrest (November 20, 2001), Mr. List was capable of behaving in a willful, knowing, and intentional manner.
>
> (2) At the time Mr. List waived his Miranda rights, he had the capacity to act in a knowing, intelligent, and voluntary manner.
>
> (3) On the day of Mr. List's arrest, there were minor factors that may have interfered to a small degree with his attention, concentration, and self-determination.
>
> (4) At the time of this evaluation, Mr. List malingered both psychological and cognitive symptoms.

[See Case No. 3:03-CR-60, Doc. 28, Sealed Report]  He said that in forming these conclusions, he interviewed the defendant for eight hours and collected information from the DEA's investigation of the defendant; legal documents such as the indictment; the defendant's notice of expert testimony and motion to suppress; audiotapes of conversations between the defendant and others both before and after the defendant's arrest; treatment progress notes and a letter from Dr. Pamela Jones; medical records from the University of Tennessee Hospital and Patricia Neal Rehabilitation Center regarding a September 2001 motorcycle accident; and a neurological evaluation by Dr. Henderson. He stated that he and Dr. Walker also administered personality tests; neuropsychological tests, which evaluate memory and cognition; and tests for malingering.

With regard to malingering, Dr. Bernet testified that the hallucinations described by the defendant (ex., seeing toy soldiers between the blades of a fan) were complicated and unusual for someone who was not psychotic and who had been diagnosed with depression.  Dr. Bernet also

said that the defendant greatly exaggerated his mental symptoms on the MMPR, a standard test. He agreed that malingering was consistent with antisocial traits. He noted that although, the defendant had been diagnosed as depressed, the defendant did not sound depressed or mentally impaired on the audiotapes but, instead laughed and joked.

On cross-examination, Dr. Bernet testified that although he had not seen the defendant's records from Drs. Workman or Demurs, he doubted that these records would have added to his evaluation because he accepted the diagnosis of depression. He stated that to his knowledge, the defendant was not malingering about his periods of depression, which started in adolescence, or the defendant's being suicidal as an adolescent. He stated that he did not know of the defendant receiving any mental health treatment from age twenty to age fifty, when he began to see Dr. Workman for pain management.

Dr. Bernet acknowledged that the following factors would have interfered with the defendant's thinking on November 20, 2001: His depressive disorder, the broken neck he suffered from a motorcycle accident, having to wear a halo screwed into his skull, his marital problems, the fact that his father had died several months earlier, and his feelings of intimidation from the DEA agents. He also stated that the defendant's medication for pain and depression could have interfered with his thinking depending upon the dose and the defendant's reaction to the medication. With regard to malingering, Dr. Bernet stated that he would be skeptical of described symptoms if a person indicated a pattern of malingering on standard tests. He explained that while fatigue might result in some inconsistent answers on the tests, it would not result in the same score as malingering, which results in exaggerated answers.

The defendant cross-examined Dr. Bernet about the methods employed in a

retrospective evaluation using an article on that subject by T.G. Gutheil, a forensic psychiatrist and professor at Harvard Medical School [see Doc. 113]. Dr. Bernet stated that consistent with the method described in the article, he had identified the defendant's mental illness at the time of the offenses, to a reasonable degree of medical certainty, as major depressive disorder and that Dr. Walker had conducted neuropsychological testing to assess the possibility of an organic disorder. He acknowledged that the dilemma in conducting a retrospective evaluation is the danger of malingering by a subject who is motivated to minimize or exaggerate. He observed that the defendant was never diagnosed with an antisocial disorder but that Dr. Jones had stated he had antisocial traits. He agreed that a person with antisocial traits could act impulsively.

Dr. Bernet opined with a reasonable degree of psychiatric certainty that the defendant's story of suicide by cop was less plausible due to his pattern of presenting malingered symptoms. He said that the defendant revealed this pattern during the two days of interviews and testing that he conducted on the defendant. He also stated that he detected a similar pattern in Dr. Jones' notes describing the defendant's suddenly bringing up suicide by cop and unusual visual hallucinations, which were inconsistent with the defendant's mental disorder. He said he also concluded that the defendant's assertion that he was attempting to commit suicide by cop was less plausible because the actions the defendant said he took were not typical of persons committing suicide by cop. He said that while he could not say that it would have been impossible for the defendant to attempt suicide by cop, all the data available to him (with the exception of the defendant's explanation) revealed that the defendant was not suicidal on the day of the offenses, and the defendant's assertion of suicide by cop was not plausible.

## 2. *The Testimony of Dr. James Walker*

Dr. Walker testified that he is a neuropsychologist at Vanderbilt School of Medicine. He said that he had given expert testimony about the defendant's state of mind at the time of the offense for both the prosecution and the defense in approximately twelve criminal trials. He said that there are accepted professional guidelines for conducting retrospective evaluations. He stated that while there is no test that tells a person's past mental state, testing can reveal a person's present mental state and then the evaluator can determine whether that condition is consistent with the defendant's actions in the past. He stated that a retrospective evaluation had the following steps: (1) interview the patient, (2) examine collateral information from the relevant time period such as records and reports from others, and (3) diagnose and explain by choosing the hypothesis that best fits the data gathered.

Dr. Walker testified that in the present case, he interviewed the defendant for a couple of hours and evaluated the defendant's mental status with neuropsychological tests that assessed his ability to think and remember and also assessed whether the defendant was malingering. He said that he also reviewed Dr. Jones' notes and Dr. Bernet's summary of the defendant's medical records. Dr. Walker's report states that he made the following conclusions to a reasonable degree of scientific certainty:

> (1) Mr. List feigned memory and reasoning problems during this evaluation.
>
> (2) Mr. List's motorcycle accident may have resulted in a very mild traumatic brain injury, but his injury was not of a degree that would be expected to cause any enduring cognitive impairment.
>
> (3) Mr. List's test scores indicated that his thinking and memory skills were generally intact at the time of

9

this evaluation.

(4) Mr. List probably has a history of recurrent mood problems, pain disorder, and antisocial personality traits.

(5) Mr. List's reports of psychiatric problems were sometimes exaggerated.

(6) Mr. List's contention that his actions in accepting a large quantity of cocaine on November 20, 2001 were motivated by an attempt to commit suicide is not very plausible.

Dr. Walker testified that the defendant did not fail the malingering scales in the less sensitive tests but failed the more subtle tests. He stated that the defendant suffered a head injury in a September 2001 motorcycle accident and that such injury could affect a persons memory and thinking for hours, days, or weeks following the injury. He said that the defendant could describe the events up to the point of impact in his accident and could remember emergency personnel being on the scene following his brief loss of consciousness. Dr. Walker stated that this placed the defendant on the mild end of the range of persons suffering this type of injury but acknowledged that a person in the mild end could have lingering problems. He said that although the defendant complained of memory problems both to him and in the contemporaneous records, he could not substantiate this due to the defendant's malingering on the tests.

Dr. Walker stated that many entries in Dr. Jones' notes caused him to question the defendant's motivations. He said that Dr. Jones diagnosed the defendant has having antisocial traits, which indicate enduring problems getting along with others. He said that this diagnosis is consistent with the defendant's history, the defendant did not behave in an antisocial way with him. Dr. Walker distinguished a critique of his report by Dr. Michael Klitzke by stating that Dr. Klitzke's

10

critique did not indicate adequate knowledge of the tests he employed (nor did Dr. Klitzke conduct any tests) and Dr. Klitzke's opinions on malingering were not in accord with others in the field.

On cross-examination, Dr. Walker testified that his area of expertise is neuropsychology. He acknowledged that the defendant suffered a head injury on September 5, 2001, approximately forty days before the alleged offenses on November 20, 2001. He stated that the defendant also reported having other prior head injuries some of which were revealed to Dr. Walker and others that Drs. Klitzke and Craig noted. Dr. Walker stated that the last head injury was the most important and that he had taken at face value that the defendant had an organic brain injury. He said that although he had great difficulty in determining whether the defendant's September 2001 brain injury had resolved before November 20, 2001, the defendant's described symptoms were inconsistent with a brain injury.

Dr. Walker testified that based upon the test results and the defendant's history, he arrived at an overall conclusion that the defendant was malingering. He said that the defendant's reports of hallucinations were inconsistent with a person who had no prior history of those symptoms. He said he felt that the defendant's behavior was consistent with the possibility of the defendant malingering in the past and that the defendant's account of suicide by cop should be carefully scrutinized. He said the defendant's performance on the tests was consistent with his conclusion that the defendant's account was not plausible.

*3. The Admissibility of the Experts' Testimony*

At the hearing, the defendant argued that a retrospective evaluation purporting to give

an opinion on the subject's motivations (as opposed to whether the subject was incompetent or insane) at a particular time in the past is not reliable. Moreover, such opinion is not helpful to the jury. He maintained that there was no link between the evaluation conducted in October 2003 and Dr. Bernet's and Dr. Walker's conclusion that the defendant was lying in November 2001 about attempting suicide by cop. He argued that the government's experts were making a leap of faith in extrapolating from their contention that the defendant malingered on tests in October 2003 that he had a pattern of malingering and that he was malingering in November 2001. He contended that while he was not challenging the validity of the tests used by Drs. Bernet and Walker or the experts' ability to read those tests, the conclusion they reached about the defendant malingering in November 2001 did not flow logically from those test results. Finally, he argued that the doctors' opinions that the defendant's account of suicide by cop was implausible and should be carefully scrutinized were not helpful to the jury. He contended that the government's experts should not be allowed to testify about plausibility.

The government argued that the defendant's disagreement with the experts' conclusions was not a valid basis for excluding the experts' testimony under <u>Daubert</u>. It contended that the defendant's complaints were not related to the validity of the experts' tests or the opinions that could be reached from those tests. The government asserted that the defendant had presented no evidence that the experts' conclusions were scientifically invalid. Finally, it noted that it would only introduce the experts' testimony on rebuttal if at all.

Although initially appearing to attack Drs. Bernet and Walker's use of a retrospective evaluation, the defendant subsequently focuses his challenge on whether the conclusions drawn by the government's experts can be logically derived from such an evaluation. Indeed, the Court finds

that the government has established through Dr. Bernet's Addendum [Doc. 113] to his Pretrial

Forensic Psychiatric Evaluation that retrospective forensic evaluations are accepted as a reliable

methodology by psychiatrists and psychologists.  Moreover, the District of Maryland has also

observed this to be the case:

> "[retrospective examinations are not in general unusual.  A very common evaluation by [a psychiatrist] is the mental state of the defendant at the time of the alleged offense which is always retrospective in nature."
> United States v. Mason, 935 F. Supp. 745, 759 (W.D. N.C. 1996), aff'd, 121 F.3d 701 (Table), 1997 WL 488763 (4th Cir. 1997).
> . . . .  Indeed, one commentator asserts that "[t]here are no reported Daubert challenges to retrospective psychiatric assessments of criminal responsibility (i.e., the reliability of the methods and procedures used to assess the mental state of a criminal defendant at a time long before the defendant was examined)."  Daniel W. Shuman, Expertise in Law, Medicine and Health Care, 26 J. Health Pol. Pol'y & L. 267, 282 (2001).

United States v. West-Bey, 188 F. Supp. 2d 576, 583-84 (D. Md 2002) (examining the need for a

retrospective competency hearing).  The defendant has presented no evidence to challenge the

methodology of retrospective examinations.  Rather, to the extent that the defendant challenges

retrospective examinations, the defendant's arguments go primarily to the weight to be accorded,

as opposed to the admissibility of, the experts' opinions.  Accordingly, the Court finds that the

experts' methodology was reliable.

At the hearing, the defendant argued that the government's expert's conclusion that

the defendant's November 2001 account of attempting to commit suicide by cop was not plausible

did not logically flow from their alleged test results indicating that the defendant was malingering

about the extent of his psychological problems in October 2003. The Court finds that the experts'
determination that the defendant was malingering during his 2003 evaluation was not the only basis
for their conclusion regarding the implausibility of the defendant's account of suicide by cop. Dr.
Bernet based this conclusion not only on the defendant's October 2003 test results but also on what
he testified were inconsistencies between the defendant's suddenly bringing up suicide by cop and
unusual visual hallucinations to Dr. Jones in 2001, and the defendant's mental disorder of
depression. He also based his conclusion upon his determination that the actions the defendant said
he took in attempting suicide were not typical of persons committing suicide by cop. Dr. Walker
also testified that he relied on the defendant's history as well as his performance on the tests in
concluding that the defendant's account of suicide by cop lacked plausibility. The Court finds that
the experts' conclusion that the defendant's account is implausible is a logical one based upon their
evaluation of the defendant's depression, Dr. Jones' notes on the defendant's actions, and their
comparison with the way in which suicide by cop is typically attempted or committed.

However, even if the lack of plausibility of the defendant's account of suicide by cop
is a logical conclusion from the experts' data as a whole, the Court finds that this opinion could
intrude upon the jury's vital and exclusive function to determine credibility issues. An expert
witness may not testify regarding credibility because credibility is an issue for the jury. Hoult v.
Hoult, 57 F.3d 1, 7 (1st Cir. 1995) (reasoning that '[w]hen an expert witness testifies with respect
to the credibility of a victim/witness there is a real danger that jurors will lend too much credence
to the expert's evaluation of the victim's credibility, at the expense of their own independent
judgment of credibility"); United States v. Rouse, 111 F.3d 561, 571 (8th Cir. 1997) (determining
expert's opinions about the credibility of the victims were properly excluded because such

14

assessment is "the exclusive function of the jury"); <u>United States v. Filler</u>, No. 98-10396, 2000 WL 123446, * 1 (9th Cir. Feb. 1, 2000) (holding that "experts may not opine on credibility"); <u>United States v. Charley</u>, 189 F.3d 1251, 1267 (10th Cir. 1999) (holding that "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702").[3]  To the extent that the government attempts to elicit testimony or the government's experts attempt to testify that the defendant was lying to Dr. Jones in November 2001 when he told her that he was attempting suicide by cop on the day of the offenses and, by inference, is lying to the jury if he asserts that as a defense at trial such would not be admissible.  The Court finds that the jury is capable of assessing the believability of the defendant without an expert opinion thereon.

On the other hand, the Court finds that the experts may testify as to whether the defendant's claim that he was attempting suicide by cop at the time of the offenses is consistent or inconsistent with the data and information they reviewed and/or is consistent or inconsistent with their opinions regarding the defendant's mental state at the time of the offense.  Specifically, these experts may testify to the inconsistency  of the defendant's accounts to Dr. Jones of being suicidal and of having hallucinations with his mental disorder in 2001.  Dr. Bernet may also testify that the

---

[3]On the other hand, some courts have permitted experts to testify that a defendant suffered from a particular mental disease or disorder of which exaggeration or lack of veracity was a symptom.  <u>See</u> <u>United States v. Gonzalez-Maldonado</u>, 115 F.3d 9, 16 (1st Cir. 1997) (concluding that expert's testimony that the defendant as a result of his mental illness was prone to exaggeration aided the jury in determining the weight to place on the defendant's recorded statements); <u>United States v. Shay</u>, 57 F.3d 126, 133 (1st Cir. 1995).  This exception is not relevant to the challenged conclusion.  The governments' experts are not contending that the defendants account of suicide by cop is implausible because persons with the defendant's physical injuries and mental condition typically prevaricate.

actions taken by the defendant in allegedly attempting suicide by cop are inconsistent with the way in which persons typically attempt or commit suicide in that manner. Such testimony will be helpful to the jury as it makes its own conclusion of whether the defendant's account of suicide by cop is credible. Further, to the extent that the defense expert, Dr. Jones should testify that the defendant's claims of attempting suicide by cop was consistent with his physical and/or mental condition at the time of the offense, then the government's experts would be permitted to rebut this conclusion and explain the basis for their rebuttal. Accordingly, the defendant's motions [**Docs. 70 and 91**] to exclude the testimony of Drs. Bernet and Walker are **GRANTED in part** in that the government's experts are not permitted to testify about the plausibility of the defendant's account of suicide by cop but are **DENIED** in all other respects.

## B.  The Defense Expert

The government challenges the admissibility of the testimony of the defense expert, Dr. Pamela Jones.   It argues that the Court should prohibit expert testimony on the defendant's mental condition unless it determines that suicide by cop is a reliable and generally acceptable medical condition, which has been tested and subjected to peer review and publication and has a known rate of error.  It contends that the Court must find that suicide by cop has underlying principles or methodologies that have statistical probability and are scientifically valid.  It asserts that the Court must also determine whether the defense expert's knowledge, skill, experience, training, and education qualifies the person as an expert in the area of suicide by cop.  Finally, the government maintains that the Court must assess whether the theory of suicide by cop is relevant

and will assist the jury in understanding the evidence or determining a fact in issue.[4]

The defendant responds [Doc. 129] that he intends to offer Dr. Jones as a treating psychologist and not as an expert on suicide by cop. He contends that Dr. Jones will testify about her diagnosis and assessment of the defendant's mental condition around the time of the alleged offenses on November 20, 2001. He argues that Dr. Jones' testimony will help the jury in determining the defendant's intent at the time of the offenses.

### 1. The Testimony of Dr. Pamela Jones

At the beginning of Dr. Jones testimony, the parties noted that they had stipulated to her vita. Dr. Jones testified that she had practiced psychology since 1994. She said she first met with the defendant in April 2001 and saw him around fifteen times before the end of November 2001. In their initial meetings, they dealt with the defendant's pain disorder, but over the course of the year, the defendant's pain was more controlled, and they met less frequently. She stated that the defendant had a motorcycle accident and that by October 2001, the defendant's pain disorder was no longer the focus of their meetings. Instead, she diagnosed the defendant with major depression and treated him for depression after his pain disorder issues were resolved.

---

[4]The Court notes that the government also appears to assert a more general challenge to the relevance of a suicide by cop defense, contending that the admissibility of this defense turns upon the defendant's ability to demonstrate clearly the manner in which such evidence negates intent rather than merely presenting a confusing defense akin to justification or excuse. The Court finds that this broad challenge to the relevance and/or admissibility of the defense itself is a matter for the trial judge, District Judge Thomas A. Varlan, to address in the context of the trial. Accordingly, the Court denies the government's motion with respect to this argument, subject to renewal with the District Court at trial. The Court will only address the relevance of the suicide by cop evidence as it implicates the <u>Daubert</u> issues before it

Dr. Jones testified that she made notes on her meetings with the defendant. She said that in October and November 2001 she noted that the defendant had suicidal ideation. She said she met with the defendant on November 29, 2001, and that he told her that in the preceding week, he had been investigated by several agencies and accused of accepting cocaine. She said that the defendant told her he knew that the police were waiting for him and that he planned to use this situation to have a police officer kill him. She said that the defendant made these statements during the course of treatment and that they were consistent with her diagnosis.

On cross-examination, Dr. Jones said that unlike in forensic evaluations, the treating psychologist took information from a patient at face value in most cases. She said that she did not try to substantiate what the defendant told her on November 29, 2001. She agreed that the defendant told her that he would pull out a gun and the police would then shoot him. She said that was the defendant's description of what would happen. She said the defendant told her he had been feeling empty and void for several days before, that he had felt emotional and physical pain, and had given up. She said that at this point in their meetings the focus was on the defendant's depression, which took the forefront after a series of traumatic incidents including a truck exploding and his father being diagnosed with cancer.

Dr. Jones testified that the defendant's depression continues today. She said that suicidal thoughts are a symptom of depression and that the presence of this symptom helps diagnose the severity of the depression, with suicidal thoughts being symptomatic of major depression. Dr. Jones testified that in her opinion, what happened on November 20, 2001, was the defendant's attempt to end his life based upon the defendant's report of what occurred and his mental condition. Dr. Jones stated that October 31, 2001, was the first time that suicide was mentioned in her notes.

She acknowledged that the defendant had not mentioned any suicidal thoughts during their August 24, 2001 meeting. She said that on October 31, she and the defendant discussed his suicidal thoughts but she noted he was far from carrying them out.

Dr. Jones testified that she had noted on April 12, May 10, July 20, July 27, and October 31, that the defendant had antisocial traits. She acknowledged that antisocial traits included dishonesty in most cases and also characterized persons who put their needs before the needs of others and did not empathize with others. She agreed that suicidal thoughts were not a part of the diagnostic criteria for antisocial traits. She stated that she noted antisocial traits on the October 31 meeting because she was watching for them.

Dr. Jones testified that she did not note suicidal ideation at the November 14, 2001 meeting with the defendant. She said that her notes revealed the defendant was doing better that day. She said that the defendant still had a diagnosis of major depressive disorder on that date but his suicidal ideas had subsided.

Dr. Jones testified that it was not her position to determine whether the defendant was really trying to commit suicide by cop. Instead, she was focused on the defendant's treatment and that his statements about suicide were consistent with his past condition. She said that she believed the defendant believed that what he told her was true. She acknowledged that it was possible that he could have told her that he intended to commit suicide by cop in order to protect himself. On the other hand, she said that based on his problems, it was probable that he had given up and wanted to die. She said the defendant's suicidal thoughts two sessions before the November 29th meeting show a pattern of the defendant thinking of suicide when he is overly stressed.

Dr. Jones testified that she and the defendant had not discussed the defendant's prior

19

suicidal thoughts and attempts other than at intake. She said that the defendant's riding a motorcycle did not cause her to question his account of his pain because the defendant's pain was managed with medicine and psychotherapy. With regard to the defendant building engines, she stated that she thought he had other people or machines to lift them. She acknowledged that bending over for a long time would be difficult for the defendant. She said that it was likely the defendant chose to pursue these activities because the emotional positives outweighed the negative of the pain involved.

Dr. Jones testified that the defendant first reported having visions or illusions on December 20, 2001, and talked of visions again on October 6, 2002. She said that she accepted the veracity of his reports because of his head injury. She said that cognitive difficulties can occur over time and that it was not unusual to see this symptom come and go.

Dr. Jones acknowledged that in her assessment on November 29, 2001, she stated that the defendant "apparently" became suicidal. She noted that she had questioned his account at the time of their meeting and that the defendant had told her that he could not get the gun out and that the police got to him first. She said he told her that he was really embarrassed that he could not take his life himself. She said that this sentiment rang true to her. She said that her notes from November 29, 2001, reflect that the defendant had spent Thanksgiving with his son and had resolved some issues with his son. In response to questioning from the Court, Dr. Jones stated that she thought that on November 20, 2001, the defendant intended to have an officer shoot him.

2.  *The Admissibility of Dr. Jones' Testimony*

At the April 14 hearing, the government argued that Dr. Jones' testimony about the defendant's intent on November 20, 2001, should be excluded. It contended that Rule 704, Fed. R.

20

Evid., prohibits expert opinion on a defendant's mental state. It maintained that Dr. Jones' testimony regarding the defendant's account of suicide by cop relates to his charge of possession of a firearm, which is a general intent crime rather than specific intent crime. The government also argued that while Dr. Jones could testify about her diagnosis of major depressive disorder, she had no basis for testifying that the defendant did not have the intent to commit a crime on November 20, 2001. The government asserted that the defendant's purported suicidal thoughts were not the basis of Dr. Jones' diagnosis and that the defendant was simply trying to introduce hearsay through Dr. Jones' description of what the defendant told her. It argued that these statements did not fall within the hearsay exception for medical treatment because the statements were given nine days after the event and were not trustworthy.

The defendant contended that the government did not state a reason for excluding Dr. Jones' testimony under Daubert. He argued that her testimony was relevant to show the defendant's specific state of mind at the time of the alleged offenses.

In its brief, the government contests Dr. Jones' qualifications to testify as an expert on suicide by cop. The Court finds that Dr. Jones does not claim to be an expert in this "field," nor does she state that suicide by cop is a mental condition. Instead, she seeks to testify as the defendant's treating psychologist to her diagnosis of major depressive disorder. She contends that the defendant's suicidal thoughts, including his purported attempt to have a police officer shoot him, are symptoms of his depression. The parties have stipulated to Dr. Jones' vita. The Court finds her qualified to testify as a clinical psychologist. Furthermore, the government conceded in oral argument at the April 14 hearing that Dr. Jones could testify about her diagnosis. The Court also finds that Dr. Jones is qualified to testify about her diagnosis of the defendant as having major

depressive disorder and the symptoms attendant thereto.

Next, the government challenges Dr. Jones' testimony by arguing that it improperly intrudes upon the jury's determination of the defendant's mental state under Rule 704, Fed. R. Evid. The rule provides as follows:

> (a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
>
> (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did nor did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed. R. Evid. 704. First, the Court notes that the rule plainly contemplates that experts may testify about a criminal defendant's mental state or condition. On the other hand, neither prosecution nor defense experts may testify whether the defendant did or did not have the requisite mental state or intent that constitutes an element of a crime or a defense thereto. They may only testify as to facts or opinions from which the jury may infer whether the defendant had the requisite mental state. See United States v. Cox, 826 F.2d 1518, 1525 (6th Cir. 1987), cert. denied, 484 U.S. 1028 (1988); see also United States v. Brown, No. 99-5395, 2000 WL 1290368, **3 (6th Cir. Sept. 6, 2000). That is, they may testify to facts or opinions which support an inference that the defendant did or did not have the requisite mental state, but they may not draw or testify to the ultimate conclusion for the jury. The Court finds that Dr. Jones' proffered testimony does not cross this line.

The government also argues that Dr. Jones' testimony is not helpful to the jury

because it is not relevant to the defendant's intent to use and carry a firearm in relation to a drug trafficking crime, as charged in count seven. It notes that possession of a firearm is a general intent crime and contends that, therefore, there is no need for Dr. Jones' testimony regarding the defendant's intent. The defendant is also charged in count six with knowingly, intentionally, and without authority, attempting to possess with the intent to distribute over five hundred grams of cocaine on November 20, 2001, a violation of 21 U.S.C. § 841. Possession with the intent to distribute a controlled substance is a specific intent crime. See United States v. Lattner, 385 U.S. 947, 957 (6th Cir. 2004), cert. denied, 125 S. Ct. 979 (2005). Thus, the defendant's ability to form the requisite specific intent on November 20, 2001, is at issue in the case. The Court finds Dr. Jones' testimony about the defendant's mental condition is relevant to this inquiry.

Finally, the government challenges Dr. Jones' testimony about the defendant's account of attempting to commit suicide by cop, arguing that such testimony is not a basis for her diagnosis of the defendant as having major depressive disorder. The government, instead, contends that Dr. Jones' testimony about what the defendant told her on November 29, 2001, is merely the defendant's means of introducing hearsay testimony before the jury.[5] The Court finds that Dr. Jones' testimony about the defendant's account are a part of her opinion on whether the defendant was suicidal during the time surrounding the offenses. Moreover, Dr. Jones testified that a person's suicidal thoughts or attempts indicate the severity of the individual's depression. As such, the defendant's account of his suicide attempt are part of Dr. Jones' assessment of the seriousness of the

---

[5]The Court notes that the parties' arguments on whether Dr. Jones' testimony about what the defendant told her fall within the hearsay exception for statements made for the purpose of medical treatment do not relate to the Daubert analysis before this Court and, instead, are for the District Court to take up either before or during the trial.

defendant's mental condition of major depressive disorder around the time of the offenses.

Accordingly, the Court finds that Dr. Jones may give expert testimony about the defendant's mental condition, particularly his depression and his suicidal ideation. The Court cautions that, as discussed above with regard to Drs. Bernet and Walker, Dr. Jones may not testify about the defendant's credibility with regard to what he told her. Although Dr. Jones announced no formal opinion about the plausibility of the defendant's account in her direct examination, the government's questions to her on cross-examination elicited responses about whether she believed the defendant's account. Instead, Dr. Jones, like Drs. Bernet and Walker, can testify as to whether the defendant's claim that he was attempting suicide is consistent or inconsistent with the data and information she reviewed or with her opinions regarding the defendant's mental condition.

*3. The Government's Request for Additional Materials*

The government has also filed a Motion for Materials of Defendant's Proposed Expert Witness Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A), (B), and (C) [Doc. 118], filed on April 6, 2005. In this motion, it seeks the disclosure pursuant to Rule 16(b)(1)(A)-(C), Fed. R. Crim. P., of all materials used by Dr. Jones, including the reports, records, and notes of Dr. Edward Workman and Dr. Robert Demers, and other healthcare providers. The government also contends that the defendant has not provided a sufficient summary sufficient summary of Dr. Jones' expert opinion under Rule 16(b)(1)(C).

At the April 14, 2005 hearing, defense counsel stated that he had responded by an April 13, 2005 letter with the materials to which the government was entitled. The government

acknowledged that it had spoken with defense counsel and Dr. Jones and that the parties were in the process of working out the issues underlying its motion. Accordingly, because the parties are resolving these issues on their own, the government's Motion for Materials of Defendant's Proposed Expert Witness Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A), (B), and (C) [**Doc. 118**] is **DENIED as moot** at this time.

## II.  CONCLUSION

Based upon a careful review of the parties' briefs, the expert testimony, and the relevant case law, the Court finds that the defendant's motions [**Docs. 70 and 91**] to exclude the testimony of Drs. Bernet and Walker are **GRANTED in part** in that the government's experts are not permitted to testify about the plausibility of the defendant's account of suicide by cop but are **DENIED** in all other respects. The government's motion [**Doc. 60**] to exclude the testimony of Dr. Jones is **DENIED**. The government's motion [**Doc. 118**] for certain materials relating to the defendant's expert is **DENIED as moot** due to the parties' agreement on this matter.

**IT IS SO ORDERED.**

ENTER:

   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge

25